UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

ROMAN G. GOLASH,

        Plaintiff,                     Case No. 21-cv-12333

v.                                       HON. MARK A. GOLDSMITH

TRINITY HEALTH CORPORATION, et al.,

        Defendants.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 30)**

Plaintiff Roman G. Golash alleges that he was improperly terminated from his position with Loyola University Health System (LUHS). He brings this Title VII suit in discrimination and retaliation against LUHS and Trinity Health Corporation, of which LUHS is a subsidiary. Before the Court is Defendants' motion for summary judgment (Dkt. 30). For the reasons that follow, the Court grants Defendants' motion.[1]

## I. BACKGROUND

Golash was fired from his position as a laboratory manager with LUHS after he replied-all to a work email with approximately 70 recipients, expressing his critical opinion of Black Lives Matter (BLM). Defendants claim that LUHS terminated Golash because his email violated LUHS policies and failed to meet the standards expected of his position, noting that Golash's supervisors had once before conferred with him about his use of his work email account for

---

[1] Because oral argument will not aid the Court's decision, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2). In addition to the motion, the briefing includes Golash's response (Dkt. 33) and Defendants' reply (Dkt. 36).

1

personal affairs. Golash, a white male, asserts that his termination violates protections established under Title VII of the Civil Rights Act of 1964, 42 USC § 2000 <u>et seq.</u>

### A. Expectations of Golash as Lab Manager

Golash began working as a manager in the Microbiology/Molecular Pathology/HLA (human leukocyte antigen) & Flow Laboratories in LUHS's Department of Pathology & Laboratory Medicine in October 2014. <u>See</u> Br. in Supp. Mot. at 1; Br. in Supp. Resp. at 2. The job description for Golash's position identifies required skills, including the "[a]bility to deal calmly and courteously with people," Job Description at PageID.263 (Dkt. 30-5), and it sets the expectation that a manager "consistently demonstrat[e]" the organization's "Magis" (Latin for "more") "values of Care, Concern, Respect and Cooperation through teamwork and effective communication in an effort to prevent and solve problems . . .," id. at PageID.262. The parties agree that Golash understood that he was responsible for demonstrating and promoting this standard. <u>See</u> Br. in Supp. Mot. at 2 (citing Golash Dep. at 34–35, 37–39, 44–47) (Dkt. 30-4));[2] Br. in Supp. Resp. at 2.

LUHS further documents its core values in its "Guidelines for Employee Conduct Policy," which states that "[e]mployees' performance and conduct should reflect the Trinity Health Core Values of Reverence, Commitment to Those Who are Poor, Justice, Stewardship and Integrity." Employee Conduct Guidelines at PageID.274 (Dkt. 30-7).

LUHS also maintains a policy that governs its employees' email, internet, and other social media usage. <u>See</u> Email Policy (Dkt. 30-8). Under this policy, employees are "accountable for the content of their [work] emails" and are directed to "consider whether LUHS

---

[2] Defendants include all of their cited deposition transcripts in a single exhibit to their motion (Dkt. 30-4).

2

would be comfortable if the communications were publicly disseminated." Id. at PageID.278. The policy prohibits the use of LUHS email for "mass" emails and other "chain letters" not specifically approved by management. Id. at PageID.280. The policy also prohibits "excessive use of email and network services for personal purposes," id.; the parties agree that Golash understood this expectation, see Br. in Supp. Mot. at 4 (citing Golash Dep. at PageID.184); Br. in Supp. Resp. at 2.

**B. March 29, 2019 Email**

On February 18, 2019, Golash used his work email account to engage in a conversation with non-employee Richard Gottschall. See 3/29/19 Email (Dkt. 30-9). Gottschall forwarded Golash an email with the subject line "Trump's speech outfoxes Nancy & the Democrats," describing President Donald Trump's state of the union speech and referring to Congresspeople as "libtards." Id. at PageID.284–285. Golash and Gottschall engaged in a follow-up discussion that included Golash's opinion that "[t]he 'common core' curriculum is indoctrinating our students, not educating them." Id. at PageID.284.

On March 29, 2019, Golash responded to Gottschall, changing the subject line to "Loyola University Medical Center- Microbiology PM Position." Id. at PageID.283. Golash's email described qualifications for an open LUHS position and directed applicants to contact Golash. Id. This email included Golash's LUHS title, work address, and LUHS email address, as well as the LUHS logo. Id. The earlier conversation regarding Trump's state of the union speech remained visible in the email thread.

It is undisputed that Gottschall then forwarded this email chain—including the political discussion lower in the thread—to the entire membership of the Illinois Society of Microbiology, which included over 400 individuals. See Br. in Supp. Mot. at 4; Br. in Supp. Resp. at 2.

### C. LUHS Response to March 29, 2019 Email

LUHS staff-person Jennifer Snowdon reported the March 29, 2019 email to Human Resources and other LUHS personnel, including Golash's direct supervisor, Jonathan Bakst (Regional Administrative Director of Laboratory Services). See March 29, 2019 Email at PageID.282.

In April 2019, Golash met with Bakst, Helen Moore (Senior Human Resources Colleague and Labor Relations Consultant), and Jean Wojtanek (interim Laboratory Manager) about the March 29, 2019 email. See Br. in Supp. Mot. at 6; Br. in Supp. Resp. at 3. Bakst asserts that LUHS leadership told Golash that his email exchange with Gottschall violated the LUHS email policy, and that Golash should refrain from discussing his political views at work because it could offend others. Bakst Decl. at PageID.293–294 (Dkt. 30-11). Moore recalled that Golash had received a "reprimand" because he used his work email to express "personal views regarding information with the [sic] Trump, Obama, and political opinions." Moore Dep. at PageID.245 (Dkt. 30-4).

Golash did not recall everything that he was told during this meeting, but he left with the understanding that his work email should not be used for non-work purposes. See Golash Dep. at PageID.189. He denies that anyone told him that his email had violated the email policy. Id.

### D. June 25, 2020 Email

On June 25, 2020, Sandee Green (Executive Secretary to Dr. Eva Wojcik, Chairperson of the Department of Pathology and Laboratory Medicine) sent an email on behalf of Rakheelah Arshad, an information technology (IT) systems analyst, to approximately 70 LUHS employees. See Br. in Supp. Mot. at 6–7; Br. in Supp. Resp. at 3.

Arshad's email, sent through Green, stated:

> I am helping to organize a customized t-shirt order in support of Black Lives Matter movement! The price per person will vary based on total number ordered but it is estimated to be $15 per t-shirt. If interested, please use the following link to indicate you would like a shirt and to vote on your favorite design: https://www.surveymonkey.com/r/FCS3TWS.

6/25/20 Email (Dkt. 30-12).

Golash replied to all email recipients:

> I think it is inappropriate to be selling these types of T-shirts on hospital e-mails. It should be "All lives Matter." We are one people, one Nation. If you read BLM's web site, they plan to get rid of nuclear families. Are we now against nuclear families? Did you know that BLM had a demonstration and chanted "Pigs in a blanket, fry like bacon." Do we now support killing cops? The co-founder of BLM admitted that she is a "trained Marxist." Do we know who Marxists are? They are communists, do we know what communist did in the past century? They murdered millions of people. My parents came from Ukraine, do you know what Stalin did to Ukrainians for not collectivizing? He orchestrated an artificial famine, 7 million Ukrainians starved to death in 1932-33. It is a shame that a Catholic institution supports Marxist ideologies. I for one, will never wear a BLM shirt.

Id.

Plaintiff testified that he sent the email because it was a "golden opportunity for a teachable moment" to inform Arshad and others about the ideologies associated with BLM. Golash Dep. at 70. He also testified that he thought Arshad "probably didn't have all of the information and I wanted to let her know what BLM said about themselves." Id. at 74.

Wojcik then emailed the entire group asking them to refrain from using LUHS emails for "non-job, non-departmental communications" (Dkt. 30-13).

### E. LUHS Response to June 25, 2020 Email

The next day, June 26, 2020, Bakst emailed Tim Brooks (Senior Human Resources Colleague and Labor Relations Consultant), stating that Golash's email was "not an appropriate, professional response" and conflicted with LUHS "values." Bakst Email at PageID.305–306 (Dkt. 30-14). Bakst states that he then discussed the email with Brooks and agreed that Golash

5

should be suspended and—pending input from Brooks's supervisor and the legal team—terminated. Bakst Decl. at PageID.294. Following a conversation with his supervisor and the legal team, Brooks discussed the matter with Bakst, and Brooks and Bakst agreed that Golash should be terminated. Bakst Decl.; Brooks Dep. at PageID.210 (Dkt. 30-4).

An employee corrective action record documents LUHS's reasons for terminating Golash, stating: "Roman Golash responded to an email on Thursday 06/25/2020 in a highly unprofessional manner (especially from a colleague in a leadership position) that violated Trinity Health Core Values and LUHS rules of conduct. Roman has demonstrated that previous counseling sessions have not changed his behaviors in a positive manner." Golash Corrective Action Record (Dkt. 30-15).

Following Golash's termination, Erin Ley—a white female—was promoted to Golash's former position. See Br. in Supp. Mot. at 12; Br. in Supp. Resp. at 7.

Arshad, a female of Pakistani descent, was also disciplined for initiating the June 20, 2020 email. A "corrective action" form shows that Arshad received counseling for her "[r]efusal or failure to abide by policies or regulations"—specifically, for violating the email policy. Arshad Corrective Action Record (Dkt. 30-16).

## II. ANALYSIS

Golash alleges violations of Title VII based on (i) discrimination and (ii) retaliation.[3] Defendants move for summary judgment.[4] The Court addresses each claim in turn.

---

[3] Title VII discrimination claims can be brought under both "single-motive" and "mixed-motive" theories, which are analyzed under different standards. See White v. Baxter Healthcare Corp., 533 F.3d 381, 400 (6th Cir. 2008). Golash asserts in his amended complaint that his action "should be analyzed as a mixed-motive case." Am. Compl. ¶ 20 (Dkt. 14). However, all arguments in his response are made under a single-motive framework, and his list of controlling or most appropriate authorities cites exclusively to single-motive cases. See Resp. at iii. The Court analyzes his claims under both standards.

## A. Single-Motive Title VII Discrimination Claims

"Title VII makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" MacEachern v. Quicken Loans, Inc., No. 17-1005, 2017 WL 5466656, at *2 (6th Cir. Oct. 17, 2017) (quoting 42 U.S.C. § 2000e–2(a)(1)) (punctuation modified). Golash alleges that "LUHS discriminated against [him] because of his status as a White male." Am. Compl. ¶ 19. Embedded in this allegation are two separate discrimination claims: one based on his race, and one based on his gender. See, e.g., Leadbetter v. Gilley, 385 F.3d 683, 690–693 (6th Cir. 2004) (analyzing gender and race discrimination claims as separate claims).

For Golash to prevail on his claims that he was discriminated against because he was white and because he was male, he must first establish a prima facie case of discrimination. See Simpson v. Vanderbilt Univ., 359 F. App'x 562, 568–569 (6th Cir. 2009). If he does so, the burden shifts to Defendants to "come forward with a legitimate, nondiscriminatory reason for the adverse employment action," after which showing the burden shifts back to Golash to

---

Golash also alleged tortious interference with a contract and with a business relationship or expectancy as to Trinity only. See Am. Compl. Defendants argue that Golash cannot prevail on his tortious interference claims. Br. in Supp. Mot. at 24–25. Golash submits that he is "not contesting Defendants' motion to dismiss his tortious interference claims." Resp. at ii. Accordingly, the Court grants Trinity summary judgment on these claims.

[4] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

7

demonstrate that the reason Defendants provided for his termination was mere pretext. Loyd v. Saint Joseph Mercy Oakland, 766 F.3d 580, 590 (6th Cir. 2014).

### i. Prima Facie Case for Reverse Race and Gender Discrimination

To establish a prima facie case of single-motive discrimination, Golash must establish that he "(1) is a member of a protected class; (2) was qualified for the job or promotion sought; (3) experienced an adverse employment action; and (4) was replaced by someone outside of the protected class or was treated differently than similarly situated employees outside the protected class." Simpson, 359 F. App'x at 568.

In "reverse-discrimination cases, where a member of the majority group claims discrimination," courts conduct a "modified analysis" as to the first and fourth prongs. Id. at 569. Both Golash's male gender and his white race qualify him for membership in a majority group for purposes of analyzing his Title VII discrimination claims.[5]

To prevail on the first prong in the "modified analysis," Golash must "demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." Simpson, 359 F. App'x at 569 (punctuation modified). To prevail on the fourth prong, Golash "must show that the defendant[s] treated differently employees who were similarly situated but were not members of the protected class." Id. The parties dispute the first and fourth prongs.

---

[5] See, e.g., Becker v. Elmwood Loc. Sch. Dist., 519 F. App'x 339, 342 (6th Cir. 2013) (treating claim that defendant discriminated against men as reverse sex discrimination suit); Simpson, 359 F. App'x at 568 (analyzing claim that defendant discriminated against plaintiff "because he is male" under reverse-discrimination framework); Bartlett v. Washington, No. 18-11508, 2019 WL 918392, at *3 (E.D. Mich. Feb. 25, 2019), aff'd, 793 F. App'x 403 (6th Cir. 2019) (treating suit based on white male status as reverse-discrimination action).

### a. Background Circumstances Supporting Suspicion of Discrimination

Golash is correct that his asserted bases of gender and race are protected designations under Title VII. See MacEachern, 2017 WL 5466656, at *2.

Golash must also demonstrate that his employer discriminates against the majority, which he may do by presenting either (i) "direct evidence" that "requires a finding that [Golash] was fired at least in part because of" his gender or race; or (ii) "indirect evidence" that "permits an inference of illegal discrimination," such as "statistical evidence or employment policies showing a history of unlawful consideration of [the protected class] by the employer, . . . evidence that the person responsible for the employment decision was a minority, . . . or evidence of ongoing [] tension [related to the protected class] in the workplace." Treadwell v. Am. Airlines, Inc., 447 F. App'x 676, 678 (6th Cir. 2011). To prevail on summary judgment, Golash must present "information about [Defendants'] treatment of Caucasian [and male] employees that would provide a contrast with its treatment" of individuals of other genders or races. Id. at 679. Golash's "own situation cannot provide that contrast," as "some indication of impermissible discrimination in addition to the plaintiff's own poor treatment is necessary to support an inference of impropriety." Id. (emphasis in original).

As Defendants correctly observe, see Reply at 6, Golash has provided no evidence suggesting even a "suspicion" that Defendants fired him based on his race or gender, or that they generally discriminate against men or white people, Simpson, 359 F. App'x at 569 (punctuation modified). He offers no statistical evidence or employment policies indicating that Defendants treat white people or males unfavorably. The decision-makers who terminated him—Bakst and Brooks—were white males, which fights the inference that he was fired on the basis of a protected status. See Treadwell, 447 F. App'x at 678. Fatally for his cause, Golash fails to

9

suggest any other incident of discrimination independent of his "own [alleged] poor treatment." Id. at 679.

Golash has produced less evidence of discrimination than the plaintiff in Treadwell, who failed to survive summary judgment on her reverse racial discrimination suit, despite the fact that she had provided witness statements attesting that her employer treated white people unequally and examples of coworkers outside of her race who were not fired for poor performance. See id. at 678–679 (concluding that plaintiff "fail[ed] to offer evidence permitting the inference that the company discriminates against Caucasians as a class"). He has produced less evidence than the plaintiff in Carey v. Foley & Lardner LLP, who failed to survive summary judgment on his claims that his law firm employer discriminated against males and white people on the basis of a memorandum pledging to "better support the professional development and improve the retention of our women attorneys." 577 F. App'x 573, 581 (6th Cir. 2014) (finding that plaintiff had failed to identify evidence "apart from his own poor treatment . . . that [his employer] discriminated against the majority white and male partners") (punctuation modified).

Golash has provided no background circumstances allowing a jury to infer that "the defendant is that unusual employer who discriminates against the majority." Simpson, 359 F. App'x at 569 (punctuation modified). On this basis alone, Golash's discrimination claims fail.

**b. Similarly Situated Employees**

"To satisfy the fourth prong in" a reverse discrimination suit, "the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." Simpson, 359 F. App'x at 569 (punctuation modified). The plaintiff must demonstrate "that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he alleges were treated more favorably." Campbell v.

10

Hamilton Cnty., 23 F. App'x 318, 325 (6th Cir. 2001). Courts consider whether the employees being compared "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in substantially identical conduct without differentiating or mitigating circumstances that would distinguish their employer's differential treatment of them." Spratt v. FCA US LLC, 812 F. App'x 348, 353 (6th Cir. 2020). "Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." Campbell, 23 F. App'x at 325.

Golash alleges that three LUHS employees were similarly situated to him: (i) Arshad, (ii) Dr. Guliz Barkan (pathologist), and (iii) Nicole Powell (Manager of Anatomic Pathology). Br. in Supp. Resp. at 18. In Golash's view, Barkan and Powell authorized Arshad to send her June 25, 2020 email. Arshad is a Pakistani female. Golash makes no allegations as to the gender or race of Powell and Barkan except to assert that they are "non-White males." Id. Regardless of their gender or race, the Court finds that none of these individuals was similarly situated to Golash.

Arshad was not similarly situated, as demonstrated by her position in LUHS's organizational hierarchy. Golash acknowledges that Arshad did not have the same supervisor as he did. See Golash Dep. at PageID.190 (acknowledging that Arshad was not in Golash's "chain of command"). She was a lower-ranked employee, "one level below" Golash. Br. in Supp. Resp. at 3. As evidenced by Golash's lab manager job description, Golash had a different "job title and responsibilities" than an IT analyst. Campbell, 23 F. App'x at 325.

In regard to their conduct, even if the Court were to assume that Arshad's June 25, 2020 email were "substantially identical" to Golash's reply email, there were "differentiating or mitigating circumstances" to distinguish LUHS's "differential treatment." Spratt, 812 F. App'x at 353. Golash sent his offending email after his superiors had already held a meeting with him

11

about how he should use his work email account, leaving him with the understanding that he should not use work email for personal reasons. See Golash Dep. at PageID.189. Golash disputes the nature of the conversation following the March 29, 2019 email and doubts that it can be considered a form of discipline; however, it is undisputed that, at the very least, his supervisors took the time to give him a talking-to about his email use. Arshad, in contrast, was a first-time offender. This difference in "disciplinary history" further exemplifies that Golash and Arshad were not similarly situated. Campbell, 23 F. App'x at 325.

Powell and Barkan were not similarly situated for the same reasons. Golash asserts that these two individuals "put up" Arshad to send the initial June 25, 2020 email. Br. in Supp. Resp. at 18. However, even assuming that the factual record would allow a jury to find that Powell and Barkan gave Arshad permission to send an email like the one she ultimately distributed, the Court finds that Powell and Barkan are not "nearly identical" to Golash in "all of the relevant aspects of his employment situation." Campbell, 23 F. App'x at 325. Golash asserts that Powell and Barkan were "levels above him," indicating that they had different supervisors. See Br. in Supp. Resp. at 2. Crucially, neither Barkan nor Powell had a history of being counseled on the proper use of their work email accounts before this June 25, 2020 exchange. In contrast, Golash's supervisors had previously sat Golash down to discuss expectations for personal use of his work email. These "differentiating . . . circumstances" prevent them from being similarly situated. Spratt, 812 F. App'x at 353; see also Campbell, 23 F. App'x at 325.

Golash—contesting the relevance of the factors discussed above—insists that "'the weight to be given to each factor can vary depending upon the particular case.'" Br. in Supp. Resp. at 18 (quoting Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003)). Golash's

abstract point that employees can be similarly situated in varying fact-specific circumstances does not avail him in the scenario presented to this Court.[6]

Golash has failed to demonstrate that "all of the relevant aspects of his employment situation" were "nearly identical" to those of Arshad, Barkan, or Powell. Campbell, 23 F. App'x at 325. For this additional reason, he fails to make out a prima facie discrimination case.

### ii. Legitimate, Nondiscriminatory Reason

Even if Golash had successfully made out a prima facie case, his claims would not survive the next steps of the inquiry. Defendants have "come forward with a legitimate, nondiscriminatory reason for the adverse employment action," Loyd, 766 F.3d at 590: that Golash was terminated not because of his membership in any protected class, but because his

---

[6] For example, Golash submits that two employees can be similarly situated if their alleged misconduct springs from the same incident. See Br. in Supp. Resp. at 17–18, (citing Gover v. Speedway Super Am., LLC, 284 F. Supp. 2d 858, 868 (S.D. Ohio 2003)). But Golash—with a reprimand on email policy already on his record—is not comparable to the plaintiff in Gover, who was sufficiently similarly situated to his coworker to survive summary judgment where they were "both supervisors" in the same "chain of command," where they both "engaged in joint conduct" in regard to the issue leading to plaintiff's termination, and where there was an "absence of additional evidence regarding Plaintiff's and [other employee's] job responsibilities, . . . and disciplinary histories." F. Supp. 2d at 868. Golash also submits that a fellow employee can be similarly situated if that employee's conduct was more serious than that of the plaintiff. See Br. in Supp. Resp. at 17–18 (citing Austin v. Long, 779 F.3d 522, 525 (8th Cir. 2015)). But to the degree that it is plausible that Arshad's conduct—or, more tenuously, Powell and Barkan's involvement in the same—was more serious than Golash's conduct, Arshad's act of sending an email is not analogous to the misconduct in Austin. In that case, the plaintiff's co-workers were treated as similarly situated because the coworkers' "convict[ions] for driving under the influence" were "comparable to or more serious than [plaintiff's] failure to contribute funds to his operational expense account." 779 F.3d at 525. Any difference in the egregiousness of the emails at issue here is not on the scale of a conviction for drunk driving compared to an oversight in financial responsibility. Golash calls the Court's attention to additional principles relevant to the "similarly situated" analysis, see Br. in Supp. Resp. at 16–18, but none of these concepts makes an employee with Golash's history similarly situated to employees with different supervisors and clean records of compliance with their employer's policies.

email violated Defendants' core values, email policy, and guidelines for employee conduct, see Br. in Supp. Mot. at 17.

The documentation on Golash's termination supports this rationale. See Golash Corrective Action Record. Further, Bakst and Brooks testified that they had determined that Golash had violated multiple core values; for example, he violated the value of "reverence" by being demeaning and not treating others with respect. See Bakst Dep. at PageID.159–160 (Dkt. 30-4), Brooks Dep. at PageID.213–214. Bakst and Brooks determined that Golash had violated rules of conduct by failing to maintain professional conduct, to treat people with respect and courtesy, and to comply with LUHS's email policy. Bakst Dep. at PageID.162, Brooks Dep. at PageID.213. As lab manager, Golash was expected to "consistently demonstrat[e]" and promote LUHS's standards. Job Description at PageID.262; Br. in Supp. Resp. at 2. On its face, Defendants' non-discriminatory rationale is legitimate.

The burden thus shifts to Golash to demonstrate that the reasons proffered for Golash's termination were mere pretext. Loyd, 766 F.3d at 589.

### iii. Pretext

Golash can demonstrate pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." Id. at 590. "[A]t bottom, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" Leilei Lin v. Henry Ford Health Sys., No. 18-13870, 2020 WL 2112351, at *9 (E.D. Mich. May 4, 2020) (punctuation modified). "In the summary judgment context, [the plaintiff] must produce 'sufficient evidence from which the jury could reasonably reject [defendants'] explanation and infer that [defendants] intentionally discriminated against him.'"

Id. (quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 586 (6th Cir. 2009) (punctuation modified)).

Golash fails to demonstrate pretext. "No matter which approach [he] takes, he fails to carry his burden to establish pretext because he does not present any evidence that his race or [gender] played any part in his termination." Id. at *10. Like the plaintiff in Lin, Golash presents no more than "bare assertions" and his inchoate "feel[ing]" as evidence of his employer's alleged animus against males or white people. Id. (granting motion for summary judgment on discrimination claim) (punctuation modified). Golash submits that he was replaced by someone who was not a white male (that is, he was replaced by a white female), see Br. in Supp. Resp. at 20–21, but this fact alone, without a hint of anti-male sentiment, bears miniscule evidentiary value. He asserts again that Arshad, Powell, and Barkan were treated more leniently for more egregious conduct, id., but even if these individuals were not distinguishable for the reasons discussed, Golash's simplification of their identities into a "non-White male" category fails to betray any discriminatory intent on the part of LUHS. Golash argues that no one else has been terminated for violating the applicable policies, see id., but he also cannot identify anyone else who had to confer with supervisors on appropriate email use; nor does he connect this argument to racial or gender bias. Golash considers it unfair that an email sent by Gottschall contributed to his termination, see id., but—aside from the considerations that Golash took the risk of emailing work-specific recruitment information on top of a political discussion, and that this March 29, 2019 email earned him no more than a warning—he still cannot articulate discrimination on the basis of a protected class.

The record demonstrates that LUHS set a standard for how its managerial staff should present themselves when using their LUHS email accounts, clarified that standard for Golash

15

individually, and then terminated him when he violated that standard. Title VII does not make this Court a "super-personnel department, second-guessing management decisions" that are "unfounded and unfair." Hardesty v. Kroger Co., 758 F. App'x 490, 496 (6th Cir. 2019) (punctuation modified). Title VII allows an employer to implement a disciplinary policy "so long as it doesn't weaponize that policy as pretext for discrimination." Id. (affirming grant of summary judgment); see also MacEachern, 2017 WL 5466656, at *3–4 (affirming grant of summary judgment where plaintiff had failed to show that reason for termination—violation of email policy after plaintiff received "training" that "such conduct was impermissible"—was pretextual). Golash has presented no basis on which to "infer" that Defendants "intentionally discriminated against him" because of his gender or race. Upshaw, 576 F.3d at 586 (punctuation modified). "Without well-grounded evidence of pretext, [Golash's] claim must fail." Hardesty, 758 F. App'x at 496.

### B. Mixed-Motive Title VII Discrimination Claims

"In a mixed-motive [] discrimination claim, both legitimate and illegitimate reasons are alleged to have motivated the adverse employment action." Lopez v. Am. Fam. Ins. Co., 618 F. App'x 794, 799 (6th Cir. 2015). To survive summary judgment on this theory, Golash must "produce[] evidence sufficient to convince a jury that" his membership in a protected class "was a motivating factor" for his termination. Id. (emphasis in original). This standard "require[s] some evidence of discriminatory bias that has some connection to the adverse employment action." Id. at 800 (emphasis in original) (affirming summary judgment on terminated Hispanic employee's discrimination claim where allegations—including that employer was explicitly "de-emphasizing the Hispanic market"—were insufficient for a jury to find that "race was a motivating factor").

Golash's mixed-motive claims fail because, as discussed, he "puts forth no evidence of discriminatory bias, whether direct or circumstantial." Ramsey v. Mnuchin, No. 1:15-CV-575, 2017 WL 2775114, at *4 n.3 (S.D. Ohio June 27, 2017) (granting motion for summary judgment on mixed-motive discrimination claim). "There is no suggestion in the record" to support Golash's allegation that anyone making employment decisions on behalf of Defendants "harbored a racial [or gender] bias." Lopez, 618 F. App'x at 801. The Court grants Defendants summary judgment on Golash's Title VII discrimination claims.

## C. Retaliation

To establish a prima facie case of retaliation under Title VII, Golash "must demonstrate that: (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (punctuation modified).

Golash has failed to demonstrate that he engaged in protected activity, and so he cannot prevail on his retaliation claim. Golash brings his claim under the opposition clause of Title VII, see Br. in Supp. Resp. at 21–23, which "makes it 'unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful'" under Title VII, Laster, 746 F.3d at 729 (quoting 42 U.S.C. § 2000e–3(a)). Golash's theory appears to be that he honestly believed that Arshad's email was unlawful under Title VII, and so he engaged in protected activity by opposing it in his reply email. See Br. in Supp. Resp. at 21–23. Golash argues that "[t]he 'All Lives Matter' statement is protected activity in the same way that opposition to an emerging hostile work environment is protected activity," especially given "the

17

close analogy to protected opposition to an emerging hostile work environment." Id. at 23. He submits that "[o]pposition to double standards has long been illegal under Title VII." Id. at 22 (citing Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 329 (N.D.N.Y. 2013)).

Golash's June 25, 2020 email cannot credibly be considered a good-faith statement of opposition to his employer's unlawful practices. Arshad was not executing any employer "practice," § 2000e–3(a); she was an IT analyst at a lower level than Golash emailing about a fundraising effort. Golash suggests that Arshad's single email organizing a t-shirt sale threatened a "hostile work environment" within the meaning of Title VII. But the fact that Title VII protects employees who complain about harassment does not make protected activity out of every reply-all to a politically charged email.

In Bader, the "hostile work environment" case on which Golash relies, the plaintiff adequately pleaded that she had engaged in multiple protected activities when she made "numerous complaints to supervisors regarding the gender-based hostile environment to which she was subjected by coworkers," like "misogynist drawings and comments regarding Plaintiff and other female employees," and when she submitted multiple reports through a service designed to compile complaints about violations of the employer's policies. 985 F. Supp. 2d at 320. The "double standard" cited in Bader refers to the plaintiff's report, submitted to the designated call center, that "there was a double standard for [Plaintiff] and other male employees." Id. at 321 (punctuation modified). This case does not expand the protections of Title VII to cover every editorial sent on the basis of perceived hostility. Nor does it immunize Golash from disregarding his employer's email policy; a Title VII claimant "must express [his] opposition in a reasonable manner," which he fails to do "when he violates legitimate rules and

orders of his employer." Jackson v. Genesee Cnty. Rd. Comm'n, 999 F.3d 333, 345 (6th Cir. 2021) (punctuation modified).

Golash fails to articulate how his June 25, 2020 email could plausibly be understood to oppose discrimination within the meaning of Title VII. Golash argues that his "statement 'All Lives Matter' reflects the bedrock principle of discrimination law that considerations of race have no place in determining the terms and conditions of employment." Br. in Supp. Resp. at 21. But his email did not argue that his employer was making race-based employment decisions. Rather, in his own words, Golash was capitalizing on a "golden opportunity for a teachable moment" relating to his opinions on BLM. Golash Dep. at 70. Golash's email appears to express political ideology, which is not protected activity under Title VII. See, e.g., Tsaganea v. City Univ. of New York, No. 06 CV 15366 (DAB), 2010 WL 1142017, at *3 (S.D.N.Y. Mar. 23, 2010), aff'd, 441 F. App'x 12 (2d Cir. 2011) ("[D]iscrimination against Plaintiff's political beliefs . . . is not unlawful or actionable under Title VII."); Jones v. Lamkin, No. CV 117-003, 2018 WL 9538939, at *8 (S.D. Ga. Sept. 24, 2018), aff'd, 781 F. App'x 865 (11th Cir. 2019) ("Political speech . . . is not protected activity under Title VII.")).

Because Golash has failed to establish that he engaged in protected activity, the Court grants Defendants' summary judgment on his retaliation claim. See Laster, 746 F.3d at 730.

### III. CONCLUSION

For the reasons explained above, the Court grants Defendants' motion for summary judgment (Dkt. 30).

SO ORDERED.

Dated: February 15, 2023  s/Mark A. Goldsmith
      Detroit, Michigan  MARK A. GOLDSMITH
                                 United States District Judge